

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-25-00503-CV

**IN THE INTEREST OF O.H.R.S.**, a Child

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2024-PA-01217
Honorable Nicole Garza, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Lori I. Valenzuela, Justice
H. Todd McCray, Justice

Delivered and Filed: January 28, 2026

REVERSED AND REMANDED

Appellants Billie Jo and Alice challenge a final judgment awarding managing conservatorship of Billie Jo's great-niece, O.H.R.S., to the child's aunt, Kristen, and Kristen's husband Troy.[1] Because Kristen and Troy did not establish standing to intervene in this litigation, we reverse the trial court's judgment and remand for further proceedings.

---

[1] To protect the privacy of the minor child, we will refer to her only by her initials. TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2). We will also use initials to refer to her biological parents, who are not parties to this appeal. Because appellant Billie Jo and appellee Kristen share a surname with each other and with O.H.R.S., we will refer to the appellants and appellees by their first names, rather than their initials, to avoid confusion.

## BACKGROUND

This case began as a suit affecting the parent-child relationship filed by the Texas Department of Family and Protective Services ("the Department"). When O.H.R.S. was born in July of 2024, her mother, N.S., was incarcerated and charged with the capital murder of O.H.R.S.'s six-year-old sister, H.S. Due to N.S.'s incarceration and the nature of the crime that led to it, the Department removed O.H.R.S. soon after her birth. When O.H.R.S. was a week old, the Department filed a petition to terminate the parental rights of both N.S. and O.H.R.S.'s alleged father, J.C. The Department also placed O.H.R.S. with Billie Jo and Alice. Billie Jo is N.S.'s aunt, and Alice is Billie Jo's wife.

Kristen is N.S.'s sister. Approximately three weeks after O.H.R.S. was born, Troy contacted the Department to express interest in serving as a placement for her. Shortly afterward, Kristen and Troy began appearing at hearings in the termination lawsuit. Kristen met O.H.R.S. for the first time in September of 2024.

On January 29, 2025, Kristen and Troy filed a petition to intervene in the termination lawsuit and asked the trial court to name them as O.H.R.S.'s permanent managing conservators. Billie Jo and Alice filed their own petition in intervention on March 18, 2025. Their petition asked the trial court to appoint either the Department or Billie Jo and Alice as permanent managing conservators.

On July 7, 2025, the parties tried the Department's termination petition to the bench. At the conclusion of the bench trial, the trial court signed an interlocutory order terminating N.S.'s and J.C.'s parental rights. Neither N.S. nor J.C. appealed the order of termination, and the merits of that order are not before us.

Immediately after the termination bench trial, the Department, Billie Jo and Alice, and Kristen and Troy tried their competing conservatorship claims to a Bexar County jury. The jury found that the appointment of Kristen and Troy as O.H.R.S.'s managing conservators was in the child's best interest. It did not find that it was in O.H.R.S.'s best interest for the Department or Billie Jo and Alice to be appointed as managing conservators or for Billie Jo and Alice to be appointed possessory conservators. The trial court signed a judgment consistent with the jury's verdict. After their post-trial motions were overruled by operation of law, Billie Jo and Alice filed this appeal.

## ANALYSIS

In two issues, Billie Jo and Alice argue that Kristen and Troy did not establish that they had standing to intervene in this matter. Kristen and Troy respond that Billie Jo and Alice waived this complaint by failing to raise it before the trial court entered its judgment. They also contend that they had standing under sections 102.004(a)(1) and/or 102.004(b) of the Texas Family Code.

### *Standard of Review*

"A party seeking conservatorship of a child must have standing to seek such relief." *In re S.M.D.*, 329 S.W.3d 8, 12 (Tex. App.—San Antonio 2010, pet. dism'd). "Standing to intervene in a suit affecting the parent-child relationship is governed by the Texas Family Code." *In re Howell*, No. 04-16-00258-CV, 2016 WL 3181338, at *1 (Tex. App.—San Antonio June 8, 2016, orig. proceeding) (per curiam) (mem. op.). "When standing has been conferred by statute, the statute itself serves as the proper framework for a standing analysis." *In re S.M.D.*, 329 S.W.3d at 12.

Standing is a question of law we review de novo. *In re J.N.M.*, 672 S.W.3d 474, 478 (Tex. App.—San Antonio 2023, pet. denied). "In evaluating standing [conferred by statute], we construe the pleadings in the plaintiff's favor, but we also consider relevant evidence offered by the parties"

and "apply principles of statutory interpretation to determine whether the plaintiff has shown he falls within the category of persons upon whom such standing has been conferred." *Id.* (internal quotation marks omitted). Where, as here, the trial court does not make separate findings of fact and conclusions of law, "we imply the findings necessary to support the judgment" and "review the entire record to determine if the trial court's implied findings are supported by any evidence." *In re S.M.D.*, 329 S.W.3d at 13. "The burden of proof is on the party asserting standing, and the petitioner must show that the facts establishing standing existed at the time the petition was filed in the trial court." *In re Schick*, No. 04-18-00839-CV, 2018 WL 6624380, at *4 (Tex. App.—San Antonio Dec. 19, 2018, orig. proceeding) (mem. op.) (internal quotation marks omitted).

### *Waiver*

We begin by addressing Kristen and Troy's contention that Billie Jo and Alice waived their standing arguments by failing to raise those arguments before the trial court rendered judgment. Kristen and Troy contend that both the Texas Supreme Court and this court have held that statutory standing under the Texas Family Code "is not jurisdictional" but is instead only a "statutory prerequisite[] to relief that may be waived if not timely raised in the trial court."

These assertions are contrary to Texas law. In fact, they are directly contradicted by Kristen and Troy's own cited authority. It is well-established that "standing involves a threshold determination of whether a plaintiff has a sufficient 'justiciable interest' in the suit's outcome to be entitled to a judicial determination." *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018). "Without standing, a court lacks subject matter jurisdiction over the case, and the merits of the plaintiff's claims thus cannot be litigated or decided." *Id.* (internal quotation marks omitted).

Despite Kristen and Troy's assertions to the contrary, neither the Texas Supreme Court nor this court has ever held that standing to participate in a family law matter is not jurisdictional or

that a complaint about a party's lack of standing can be waived. To the contrary, we have held that standing "is a threshold issue that we may address for the first time on appeal." *In re A.C.F.H.*, 373 S.W.3d 148, 150 (Tex. App.—San Antonio 2012, no pet.). We have also repeatedly held in family law matters that "a party's lack of standing deprives the court of subject matter jurisdiction and renders subsequent trial court action void." *In re S.M.D.*, 329 S.W.3d at 12; *see also In re Guardianship of C.E.M.-K.*, 341 S.W.3d 68, 76 (Tex. App.—San Antonio 2011, pet. denied); *In re H.G.*, 267 S.W.3d 120, 124 (Tex. App.—San Antonio 2008, pet. denied) (op. on reh'g). Finally, we have explicitly rejected the notion that standing in a family law case can be conferred or lost through waiver:

> Standing is not merely a "statutory bar." Rather, standing is a component of subject matter jurisdiction. . . . Subject matter jurisdiction exists by operation of law and cannot be conferred or taken away by consent or waiver.

*In re H.G.*, 267 S.W.3d at 124 (internal citations omitted); *see also In re A.C.F.H.*, 373 S.W.3d at 150.

In short, Kristen and Troy's waiver argument is wholly without merit. We will therefore proceed to the issue of whether they had standing to intervene in this case.

### *Standing Under Section 102.004(a)*

In their petition in intervention, Kristen and Troy alleged that they had standing under section 102.004(a)(1) of the Texas Family Code. They did not allege any other bases for their standing below. In their first issue, Billie Jo and Alice argue Kristen and Troy failed to establish standing under that statute.

### *Applicable Law*

The version of section 102.004 that applies to this case provided that "a grandparent, or another relative of the child related within the third degree by consanguinity, may file an original

suit[2] requesting managing conservatorship if there is satisfactory proof to the court that . . . the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development[.]" TEX. FAM. CODE § 102.004(a)(1).[3] "When a party is statutorily required to establish standing with 'satisfactory proof,' as section 102.004(a)(1) requires, the evidentiary standard is by a preponderance of the evidence." *In re Chester*, 398 S.W.3d at 800. "We review the 'present circumstances' of the child as they existed at the time the intervention was filed." *Id.*

Texas courts have held that the trial court can consider issues like "[p]hysical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior on the part of the [caregiver]" and "the danger of uprooting a child" in assessing significant impairment. *See, e.g.*, *In re L.D.F.*, 445 S.W.3d 823, 830 (Tex. App.—El Paso 2014, no pet.) (internal quotation marks omitted). "Section 102.004(a)(1) requires 'satisfactory proof' of substantial impairment to the children and not merely the pleading of facts." *Rolle v. Hardy*, 527 S.W.3d 405, 418 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Evidence that raises a mere surmise or speculation of potential harm is not sufficient. *See id.* at 420.

*Application*

1. Troy's Standing

Troy is married to O.H.R.S.'s maternal aunt, Kristen. He is therefore related to O.H.R.S. by affinity, not consanguinity. *See* TEX. GOV'T CODE § 573.024(a)(2); *In re A.M.S.*, 277 S.W.3d

---

[2] Billie Jo and Alice correctly note that Kristen and Troy filed a petition in intervention, not an original suit. However, we have previously held that where a party "had standing under 102.004(a)(1) to bring an original suit, she clearly ha[d] standing to intervene in the pending suit." *In re Chester*, 398 S.W.3d 795, 801–02 (Tex. App.—San Antonio 2011, orig. proceeding).

[3] The Texas Legislature amended section 102.004(a) effective September 1, 2025. Our citations to the statute are to the version that was in effect when Kristen and Troy intervened in this case.

92, 98 (Tex. App.—Texarkana 2009, no pet.). As a result, he cannot establish standing under section 102.004(a)(1). *See* TEX. FAM. CODE § 102.004(a)(1); *In re A.M.S.*, 277 S.W.3d at 98–99.

### 2. Kristen's Standing

Kristen is the sister of O.H.R.S.'s mother and is thus related to O.H.R.S. within the third degree of consanguinity. *See* TEX. GOV'T CODE § 573.023(c)(3) (identifying "aunt who is a sister of a parent of the individual" as a relative within the third degree of consanguinity). Accordingly, the only question before us on this issue is whether Kristen presented satisfactory proof that O.H.R.S.'s present circumstances at the time of the intervention would significantly impair her physical health or emotional development. TEX. FAM. CODE § 102.004(a)(1).

On appeal, Kristen argues that she established standing under section 102.004(a)(1) by showing that the appointment of O.H.R.S.'s biological parents as managing conservators would significantly impair her physical health or emotional development. It is true that some portions of the Family Code specifically call for consideration of the potential threat posed by a child's parents. *See, e.g.*, TEX. FAM. CODE § 153.131(a). But section 102.004(a)(1) does not. Instead, it refers more generally to the child's "present circumstances." TEX. FAM. CODE § 102.004(a)(1). We must presume that the legislature chose each word of section 102.004(a)(1) for a reason, *see, e.g.*, *Walgreens v. McKenzie*, 713 S.W.3d 394, 399 (Tex. 2025), and we must apply that statutory language as written unless it would lead to an absurd or nonsensical result. *See Dep't of Fam. & Protective Servs. v. Alternatives in Motion*, 210 S.W.3d 794, 801–02 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

As written, section 102.004(a)(1) requires us to broadly consider O.H.R.S.'s "present circumstances" at the relevant time, not the narrower question of whether her biological parents would have been appropriate conservators. TEX. FAM. CODE § 102.004(a)(1). Because Kristen has

not presented any argument or authority to support a conclusion that this is an absurd result, we will apply the statute as written and will not limit our review to the fitness of O.H.R.S.'s biological parents. *See id.*; *see also In re P.R.*, No. 02-25-00543-CV, 2025 WL 3559018, at *5 (Tex. App.—Fort Worth Dec. 11, 2025, orig. proceeding) (mem. op.) (rejecting argument that applying Family Code standing provision as written would create absurd result).

In an affidavit she filed in support of her intervention, Kristen averred that O.H.R.S. "was placed with a great aunt at the time [of her removal] for which we have concerns with her being placed there." Although the affidavit does not mention Billie Jo by name, O.H.R.S. was living in Billie Jo's home at that time.[4] Kristen's affidavit did not identify any specific concerns about Billie Jo or her home or offer any factual bases for those concerns. The affidavit also did not contain any additional statements about O.H.R.S.'s then-present conditions or contend that those conditions would significantly impair her physical health or emotional development. These conclusory allegations in Kristen's affidavit fall short of the "satisfactory proof" necessary to establish her standing under section 102.004(a)(1). *See In re G.D.L.*, No. 10-23-00011-CV, 2023 WL 5624064, at *3 (Tex. App.—Waco Aug. 30, 2023, no pet.) (mem. op.); *Rolle*, 527 S.W.3d at 418–20.

Outside of Kristen's affidavit, the record that was before the trial court when Kristen and Troy intervened showed that O.H.R.S. was six months old and had been living with Billie Jo and Alice since she was released from the hospital after her birth. At trial, the Department's caseworker testified that she did not have any concerns about Billie Jo and Alice's care of O.H.R.S. She also testified that Billie Jo and Alice had "demonstrated that they're able to provide a safe, stable home

---

[4] In their brief, Kristen and Troy suggest that the Department placed O.H.R.S. with Billie Jo and Alice after Kristen and Troy intervened on January 29, 2025. The record directly contradicts this assertion. O.H.R.S. was born in July of 2024, and it was undisputed below that the Department placed her in Billie Jo and Alice's home when she was a week old. Kristen herself testified that she first met O.H.R.S. at Billie Jo and Alice's home and that the child had lived there since the beginning of the Department's involvement with her.

environment" for O.H.R.S. and that they had "met all their [*sic*] needs, basic needs, emotional needs, therapeutic needs."

Kristen's older sister, Misty, testified that when she was a teenager, she heard Billie Jo using corporal punishment to discipline their brother, who was "12 or 11" when that incident allegedly occurred. However, neither Misty nor any other witnesses testified that Billie Jo engaged in such behavior while caring for O.H.R.S. To the contrary, Misty testified that she trusted Billie Jo with her own children and that Billie Jo was the person she would call if she needed something. She also added that the incident she described with her brother "was the first time that [she had] seen something or heard something like that coming from" Billie Jo. Misty's testimony about an isolated event that occurred approximately twenty years before O.H.R.S. was born was not evidence that O.H.R.S.'s placement with Billie Jo and Alice would significantly impair the child's physical health or emotional development. *Cf. In re Clayborn*, No. 02-12-00299-CV, 2012 WL 3631243, at *3 (Tex. App.—Fort Worth Aug. 24, 2012, orig. proceeding) (per curiam) (mem. op.) (holding that a three-year-old social study was "not evidence of [the child's] present circumstances").

During the trial, Kristen and Troy's cross-examination of Billie Jo focused extensively on her relationship with N.S., whether she should have foreseen the danger N.S. posed to O.H.R.S.'s older sister, H.S., and whether she could have done more to protect H.S. on the day N.S. murdered her. But when Kristen and Troy intervened in this lawsuit—*i.e.*, the only time relevant to this standing analysis—N.S. was incarcerated without access to O.H.R.S. There was no evidence that Billie Jo or Alice allowed N.S. to access or contact O.H.R.S., and Billie Jo testified that they would not do so. The testimony about Billie Jo's actions around the time of the murder did not support a logical inference that any "specific, identifiable behavior or conduct" by Billie Jo would "probably

result in [O.H.R.S.] being emotionally impaired or physically harmed." *See In re S.M.D.*, 329 S.W.3d at 16.

On this record, Kristen failed to present the satisfactory proof necessary to meet the significant impairment prong of section 102.004(a)(1). As a result, neither she nor Troy successfully established standing under section 102.004(a)(1), and we sustain Billie Jo and Alice's first issue.

### Standing Under Section 102.004(b)

In their second issue, Billie Jo and Alice argue that Kristen and Troy did not establish standing under section 102.004(b).

### Applicable Law

When Kristen and Troy intervened in the termination suit, the applicable version of section 102.004(b) provided that a court may grant an individual who is "deemed by the court to have had substantial past contact with the child" leave to intervene in a pending suit "if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development." TEX. FAM. CODE § 102.004(b); *see also In re Nelke*, 573 S.W.3d 917, 921–22 (Tex. App.—Dallas 2019, orig. proceeding) (interpreting section 102.004(b)). Billie Jo and Alice do not dispute that the appointment of O.H.R.S.'s biological parents as her managing conservators would significantly impair her physical health or emotional development. *See* TEX. FAM. CODE § 102.004(b). Accordingly, the only question before us on section 102.004(b) is whether the evidence supports the trial court's implied finding that Kristen and/or Troy "had substantial past contact with" O.H.R.S. at the time of their intervention. *Id.*

"What constitutes 'substantial past contact' is not statutorily defined[.]" *In re Tinker*, 549 S.W.3d 747, 751 (Tex. App.—Waco 2017, orig. proceeding). We have previously noted that the word "substantial" generally means "of ample or considerable amount, quantity, size, etc." *In re Schick*, 2018 WL 6624380, at *4 (internal quotation marks omitted). In considering this issue, we "should focus on the amount of actual contact the child had with the adult" rather than on any issues the adult encountered in maintaining contact. *See id.*; *In re Tinker*, 549 S.W.3d at 751; *In re C.M.C.*, 192 S.W.3d 866, 871–72 (Tex. App.—Texarkana 2006, no pet.).

*Application*

Kristen's affidavit in support of her intervention averred that she and Troy were "currently having unsupervised visits with [O.H.R.S.] on request." The affidavit further stated that Kristen and Troy "absolutely adore the time spent with [O.H.R.S.] and want to spend more time with her." Finally, the affidavit stated that Kristen and Troy had attended "every hearing" and that their home study had been approved. However, the affidavit did not specify how many times Kristen and Troy had visited O.H.R.S., state how long those visits lasted, or otherwise provide a means by which the trial court could gauge how much time O.H.R.S. had spent with Kristen and Troy. Because the affidavit did not contain any substantive description of Kristen and Troy's past contact with O.H.R.S., it was insufficient to support a finding of substantial past contact. *See In re Schick*, 2018 WL 6624380, at *4 (intervenor bears burden to establish standing).

We must therefore determine whether the evidence presented at trial supported a finding that Kristen and/or Troy had substantial past contact with O.H.R.S. The evidence showed that at all times relevant to this case, Kristen and Troy lived in the Houston area, a three-hour drive away from where O.H.R.S. lived in San Antonio. Kristen testified that she comes to San Antonio to see her extended family "[a]s often as possible with [her] schedule" and that she typically "come[s]

- 11 -

for the day and then return[s] home the same day." She also testified that she first met O.H.R.S. in September of 2024—approximately two months after O.H.R.S.'s birth—during a visit at which Troy was not present.

A Department caseworker testified that Kristen and Troy visited O.H.R.S. on October 24, 2024 for two hours, on an unspecified date in November 2024 for four hours, and on an unspecified date in December 2024 for four hours. The caseworker testified that the visits were "not overnight." Kristen similarly testified that their visits with O.H.R.S. in the fall of 2024 lasted for "a few hours" at a time. Troy described the time he and Kristen had spent with O.H.R.S. as "limited" and testified:

> So we worked during the week, so those are pretty much off [for visits]. Weekends. I mean there's only so much we can do. It's a long drive. [Billie Jo and Alice] weren't willing to meet us half way to come to us. So with that, we thought one time per month, respected their time, respected our time and allowed us to start building that bond with [O.H.R.S.].

Kristen and Troy did not visit O.H.R.S. in January of 2025, the month they filed their petition in intervention. At the time of trial, approximately six months after Kristen and Troy intervened, O.H.R.S. had not yet visited their home.

The evidence described above showed that between O.H.R.S.'s birth in July 2024 and Kristen and Troy's intervention in January 2025, Kristen visited O.H.R.S. four times and Troy visited her three times, with each visit lasting no more than a few hours. Even when viewed in the light most favorable to Kristen and Troy, this does not approach the kind of actual contact that Texas courts have concluded was sufficient to establish standing to intervene. *See, e.g.*, *In re N.L.G.*, 238 S.W.3d 828, 831 (Tex. App.—Fort Worth 2007, no pet.) (foster parents had substantial past contact with child who "had lived with [them] for her entire life, excluding the first seven days following her birth"); *In re A.M.*, 60 S.W.3d 166, 169 (Tex. App.—Houston [1st Dist.] 2001,

no pet.) (foster parents had substantial past contact with child where they had cared for her "14 out of the 17 months of her life"); *In re Hidalgo*, 938 S.W.2d 492, 494–95 (Tex. App.—Texarkana 1996, no writ) (step-grandmother had substantial past contact with child where she "had been close, both emotionally and physically, to the child since her birth" and child lived with her for two months prior to step-grandmother's intervention). These facts are instead more similar to cases where Texas courts—including this court—held there was no evidence of substantial past contact. *See In re Schick*, 2018 WL 6624380, at *6 (evidence of three in-person visits "lasting an hour to an hour and a half" was insufficient to show substantial past contact); *In re C.M.C.*, 192 S.W.3d at 871–72 ("extremely minimal" contact consisting of correspondence, monthly phone calls, and two in-person visits was insufficient to establish substantial past contact); *Segovia-Slape v. Paxson*, 893 S.W.2d 694, 696–97 (Tex. App.—El Paso 1995, no writ) ("a short-term living arrangement of but a few weeks" was insufficient to establish substantial past contact).

Because Kristen and Troy did not present evidence that they had substantial past contact with O.H.R.S. at the time of their intervention, they did not establish standing to intervene under section 102.004(b). We sustain Billie Jo and Alice's second issue.

### *Standing Under Section 102.004(a)(2)*

Billie Jo and Alice's brief includes a footnote stating, "There is no evidence in the record to support that any parent or party consented to [Kristen's] intervention pursuant to Subsection 102.004(a)(2)." *See* TEX. FAM. CODE § 102.004(a)(2) (relative of child within third degree of consanguinity may file original suit if there is satisfactory proof that "both parents, the surviving parent, or the managing conservator or custodian either filed the petition or consented to the suit"). The parties' briefing does not contain any further discussion of section 102.004(a)(2). Nevertheless, we will consider whether the Department, which was O.H.R.S.'s temporary

managing conservator at the relevant time, consented to Kristen's intervention by failing to object to it. *See In re S.S.J.-J.*, 153 S.W.3d 132, 134 (Tex. App.—San Antonio 2004, no pet.) (noting we review standing de novo). If so, that consent would establish Kristen's standing to file an original suit and thus would establish her standing to intervene under our existing precedent. *See* TEX. FAM. CODE § 102.004(a)(2); *In re Chester*, 398 S.W.3d at 801–02.

For several reasons, we decline to hold that the Department gave the required consent here. First, Kristen did not raise this argument below or in this court. *See, e.g.*, *Martinez v. Estrada*, 392 S.W.3d 261, 263 (Tex. App.—San Antonio 2012, pet. denied) ("The party seeking relief must allege and establish standing within the parameters of the language used in the statute."). Consequently, neither the Department nor Billie Jo and Alice have had an opportunity to develop evidence to refute it.

Second, there is nothing in either the clerk's record or the reporter's record to support a conclusion that the Department affirmatively consented to Kristen's intervention. While the legislature did not "limit the form and nature of consent," we conclude that the statute requires evidence of consent "given by the proper party and established in the record[.]" *In re A.M.S.*, 277 S.W.3d at 98.

Finally, we cannot say that the unpleaded issue of whether the Department tacitly consented to Kristen's intervention was tried by consent. "Trial by consent is a doctrine that is only intended to cover the exceptional case in which it clearly appears from the record as a whole that the parties tried the unpleaded issue, and it is not intended to establish a general rule of practice and should be applied with care." *Kebodeaux v. Kebodeaux*, No. 04-20-00147-CV, 2021 WL 3639814, at *3 (Tex. App.—San Antonio Aug. 18, 2021, no pet.) (mem. op.). We have thoroughly reviewed the record and see no indication that the parties presented evidence on the Department's

consent (or lack thereof) to Kristen and Troy's intervention. *See In re K.N.J.*, No. 10-25-00117-CV, 2025 WL 2476365, at *3 (Tex. App.—Waco Aug. 28, 2025, no pet.) (mem. op.).

We are troubled by the fact that the Department allowed this case to proceed to a jury trial and a final judgment without either affirmatively consenting to or challenging Kristen and Troy's intervention. We nonetheless conclude that its silence alone cannot be interpreted as the consent required by section 102.004(a)(2). Kristen and Troy therefore failed to establish standing to intervene under that statute.

## CONCLUSION

The record plainly shows that all the parties to this case love O.H.R.S. and want to do what is best for her. And given the amount of loss and trauma O.H.R.S. has already experienced in her very young life, we are loathe to subject her to even more instability and uncertainty. Nevertheless, the statutory standing provisions of the Texas Family Code are jurisdictional and essential to the trial court's authority to act. *See In re H.G.*, 267 S.W.3d at 124–25 (noting equity "cannot confer jurisdiction where none exists"). Because we have concluded that Kristen and Troy did not establish their standing to intervene, we have no choice but to reverse the trial court's judgment appointing them as O.H.R.S.'s managing conservators. We remand this matter for further proceedings consistent with this opinion.

Lori I. Valenzuela, Justice